# In re L-K-, Respondent

*Decided September 30, 2004*

U.S. Department of Justice
Executive Office for Immigration Review
Board of Immigration Appeals

(1)  Under section 245(c)(2) of the Immigration and Nationality Act, 8 U.S.C. § 1255(c)(2) (2000), an alien who has failed to continuously maintain a lawful status since entry into the United States, other than through no fault of his own or for technical reasons, is ineligible for adjustment of status under section 245(a) of the Act.

(2)  A failure to maintain lawful status is not "for technical reasons" within the meaning of section 245(c)(2) of the Act and the applicable regulations at 8 C.F.R. § 1245.1(d)(2)(ii) (2004), where the alien filed an asylum application while in lawful nonimmigrant status, the nonimmigrant status subsequently expired, and the asylum application was referred to the Immigration Court prior to the time the alien applied for adjustment of status.

FOR RESPONDENT:  Olga Floroff, Esquire, Elmhurst, New York

FOR THE DEPARTMENT OF HOMELAND SECURITY:[1]  Douglas C. Ligor, Assistant Chief Counsel

BEFORE:  Board Panel:  SCIALABBA, Chairman; OSUNA and PAULEY, Board Members.

SCIALABBA, Chairman:

The Department of Homeland Security ("DHS," formerly the Immigration and Naturalization Service) has appealed from the Immigration Judge's September 27, 2002, decision to grant the respondent[2] adjustment of status

---

[1]  The functions of the Immigration and Naturalization Service have been transferred to the Department of Homeland Security pursuant to the Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135.  The transfer occurred on March 1, 2003.  *See Matter of D-J-*, 23 I&N Dec. 572, 573 n.1 (A.G. 2003).

[2]  Although both the respondent's case and that of her daughter were remanded by the Board on July 3, 2002, neither the Immigration Judge's decision on remand nor the DHS appeal references the daughter.  Thus, it does not appear that the decision rendered by the Immigration Court included the daughter, and her case is therefore not affected by this appeal.

under section 245(a) of the Immigration and Nationality Act, 8 U.S.C. § 1255(a) (2000). The DHS appeal will be sustained, and the record will be remanded.[3]

The respondent is a native of the Union of Soviet Socialist Republics and a citizen of Ukraine. She initially entered the United States in March 1993 as a nonimmigrant visitor who was authorized to remain until September 25, 1993. On August 27, 1993, she filed an asylum application with the DHS. That asylum application remained pending at the time her nonimmigrant status expired, and the record reflects that she appeared for an interview before an asylum officer on January 28, 1997. After that date, the asylum application was apparently referred to the Immigration Court under 8 C.F.R. § 208.14(b)(2) (1997), and an Order to Show Cause and Notice of Hearing (Form I-221) was issued on January 29, 1997, which was served on the respondent on February 11, 1997.

The respondent appeared for her scheduled deportation hearing and resubmitted her application for asylum and withholding of deportation. In a decision dated July 16, 1999, the Immigration Judge denied her application. She appealed from that decision. While her appeal was pending, she received notice that she had been approved to receive a diversity visa through the fiscal year 2002 lottery, and she requested a remand from the Board, which was granted. She submitted an application for adjustment of status to the Immigration Court based on the availability of the diversity visa. In an order dated September 27, 2002, the Immigration Judge granted adjustment over the DHS's objection that the respondent did not qualify for that relief because she was not in lawful status. The DHS has appealed from this decision.

## I. DHS APPEAL OF THE GRANT OF ADJUSTMENT OF STATUS

We first address whether the Immigration Judge erred in her 2002 decision that the respondent qualified for adjustment of status. Adjustment of status under section 245(a) is generally unavailable to "an alien . . . who has failed (other than through no fault of his own or for technical reasons) to maintain continuously a lawful status since entry into the United States." Section 245(c)(2) of the Act. It is also unavailable to "any alien . . . who has otherwise violated the terms of a nonimmigrant visa." Section 245(c)(8) of the Act.

Although some persons precluded from seeking adjustment under section 245(c) of the Act are allowed to apply for adjustment under the additional requirements set forth in section 245(i) of the Act, the applicable regulations extending the dates for section 245(i) availability specifically preclude diversity visa recipients from being considered "grandfathered" aliens on the basis of the

---

[3] The Board requested that the parties file supplemental briefs in this case and we express our gratitude for the briefs submitted.

diversity visa alone. They may pursue an adjustment application on the basis of the diversity visa if they may be considered grandfathered on another basis. *See* section 245(i)(1)(A) of the Act; 8 C.F.R. § 1245.10(h) (2004).[4] Thus, the respondent, who only had a visa available through the diversity visa lottery process, must meet the requirements of sections 245(a) and (c).

It is undisputed that the respondent was not in "lawful immigration status" after the expiration in September 1993 of her authorized stay pursuant to the nonimmigrant visa. 8 C.F.R. § 1245.1(d)(1)(ii) (2004). The pivotal question in this case is whether her failure to maintain lawful status was for "technical" reasons by virtue of the pendency of her asylum application that had been filed while she was in nonimmigrant status. Section 245(c)(2) of the Act; 8 C.F.R. § 1245.1(d)(2)(ii).

We agree with the DHS that the respondent is ineligible for adjustment of status because her unlawful immigration status was not "for technical reasons." The regulations define the term "other than through no fault of his or her own or for technical reasons," in pertinent part, as "[a] technical violation resulting from inaction of the [DHS] (as for example, where an applicant establishes that he or she properly filed a timely request to maintain status and the [DHS] has not yet acted on that request)." 8 C.F.R. § 1245.1(d)(2)(ii).[5]

The DHS argues that because the example provided refers to a "request to maintain status," rather than a request for any status, the language of the regulation implies that the request must relate to the particular status the applicant already possesses and wishes to "maintain." The DHS also contends that when a different status, such as asylum status,[6] is requested, any lapse of the initial status is not one "resulting from" the DHS's action or inaction with regard to that other status. We do not reach either argument and express no opinion thereon. We point out that both of these arguments carry adverse implications for the ability of aliens to adjust in other contexts, and that the DHS failed to respond adequately to the Board's repeated requests relating to its own practices in this regard.[7]

---

[4] We also note that section 245(i) of the Act has not been extended to apply to adjustment of status applications based on family-based or employment-based visa petitions filed after April 30, 2001.

[5] The regulations do not distinguish between the terms "no fault" and "technical reasons" but, instead, treat them as a unitary concept.

[6] A grant of asylum confers asylum status on the applicant. *See* section 208(c) of the Act, 8 U.S.C. § 1158(c) (2000); 8 C.F.R. §§ 1208.14(f), 1208.21(c), 1208.22 (2004).

[7] In particular, the Board requested information from the DHS at oral argument and in supplemental briefs regarding the current practices in its District Offices and Service Centers relating to the processing of applications for adjustment of status for individuals similarly situated to the respondent. We did not receive any concrete information from the

(continued...)

Even assuming, as argued by the respondent, that the language of 8 C.F.R. § 1245.1(d)(2)(ii) relating to requests to maintain status may be applied more broadly to any request to continue in lawful immigration status in this country, we find that the "technical reasons" for being out of lawful status end when the DHS acts other than favorably on a pending asylum application. We conclude that an "action" by the DHS does not necessarily require a final adjudication on the merits of an asylum application, as the respondent appears to argue.

Under applicable asylum regulations, asylum officers (acting on behalf of the DHS) are authorized to approve, deny, refer, or dismiss the asylum application. *See* 8 C.F.R. §§ 1208.14(b), (c) (2004); *see also* 8 C.F.R. § 1208.19 (2004) (describing the various types of "decisions" of an asylum officer, including one to "refer an asylum application"). We find that any one of these constitutes an "action" on the part of the DHS. More particularly, we note that the referral of an asylum application to the Immigration Court under the regulations completes the DHS's consideration of that application and transfers further consideration or action on that application to another agency.[8] As such, it constitutes a significant "action" on the DHS's part.

In further support of this interpretation, we point out that had the drafters of the adjustment regulation intended the pendency of an asylum application to be considered a "technical reason" for being out of lawful status, such language could easily have been included in the regulation. *Cf., e.g.*, section 212(a)(9)(B)(iii)(II) of the Act, 8 U.S.C. § 1182(a)(9)(B)(iii)(II) (2000) (providing, with a limited exception, that "[n]o period of time in which an alien has a bona fide application for asylum pending under section 208 shall be taken

---

[7] (...continued)

DHS in this regard. In addition, we note that the DHS's suggestion that the respondent "could easily have filed for an extension of her authorized stay to keep her non-immigrant status while the asylum application was adjudicated," borders on disingenuous. The DHS has presented no evidence of a policy to grant multiple nonimmigrant extension requests where an asylum application has been filed, or of the likelihood that extensions of the respondent's nonimmigrant visa would have been granted for the 3½ years her asylum application was pending prior to its referral to the Immigration Court. 8 C.F.R. §§ 214.1(c)(2), 214.2(b)(1) (2004).

[8] The asylum regulations were amended in 1995 to provide that asylum officers who do not grant asylum must refer the applications of inadmissible or deportable aliens to the Immigration Court, rather than issue denials. Rules and Procedures for Adjudication of Applications for Asylum or Withholding of Deportation and for Employment Authorization, 59 Fed. Reg. 62,284, 62,300 (1994) (codified at 8 C.F.R. § 208.14(b)(2)) (effective Jan. 4, 1995). The Supplementary Information to those amendments reflects that the intent in designing this referral process was to avoid the administrative inefficiencies of providing time-consuming notices of intent to deny and written denials in cases where aliens would have a full opportunity to present their claims before an Immigration Judge. *See* 59 Fed. Reg. at 62,284, 62,293-94.

into account in determining the period of unlawful presence in the United States" for purposes of inadmissibility under that section).

As previously noted, 8 C.F.R. § 1245.1(d)(2)(ii) relates only to technical violations of status due to "inaction of the [DHS]." It specifically provides that the applicant will not be considered to have failed to maintain status if a request to maintain status has been made and "the [DHS] has not yet acted on that request." Thus, once the DHS has acted upon a pending asylum application, the "technical" reasons for the violation cease to exist, and the applicant may no longer be considered to be out of status for technical reasons.

In this case, the respondent filed an asylum application while she was still in nonimmigrant status. That status expired while the asylum application was pending. The asylum officer then referred the asylum application to the Immigration Court in January 1997. Once the DHS acted on the respondent's asylum application by referring it to the Immigration Court, the respondent could not be considered out of status "for technical reasons." She did not seek to apply for adjustment of status until well after the referral. Consequently, we agree with the DHS that the respondent was precluded from seeking adjustment of status under sections 245(a) and (c) of the Act.

As a final matter, the parties have responded to our request for opinions regarding the applicability to this case of certain DHS opinion letters and an unpublished decision of the DHS's Administrative Appeals Unit. *See Matter of Orban* (AAU Dec. 23, 1993) (unpublished); Letter from Edward H. Skerrett, Chief, Immigrant Branch, Adjudications, to Ron Tasoff, Esq. (Apr. 6, 1994), *reprinted in* 71 *Interpreter Releases*, No. 18, May 9, 1994, at 621, 641-42 (Appendix II); Letter from James Puleo, Assistant Commissioner, Adjudications, to Paul Parsons, P.C. (Nov. 2, 1987), *reprinted in* 64 *Interpreter Releases*, No. 48, Dec. 21, 1987, at 1389, 1412 (Appendix IX).

First, we point out that these opinions are not binding precedent for the Board. *See, e.g.*, *Matter of Ma*, 22 I&N Dec. 67 (BIA 1998). In any event, however, they are inapplicable to this case because each involves a factual scenario distinguishable from that at issue here. Both the 1993 *Matter of Orban* decision and the 1987 Puleo letter addressed situations where an alien's asylum application remained pending before the DHS at the time that eligibility for adjustment of status was being considered. The 1994 Skerrett letter addressed a situation where an asylum application was denied only after an adjustment application had been filed and was pending with the DHS. In this case, the asylum application was referred to the Immigration Court well before the adjustment application was filed. Moreover, the DHS has stated its position that those opinions are not correct, especially as they predate numerous statutory, regulatory, and policy changes regarding the processing of asylum and adjustment applications. Consequently, they are not directly on point, and they do not appear to set forth the DHS's current policy with regard to these issues.

In view of the foregoing, we agree with the DHS that the respondent was not properly granted adjustment of status. The respondent filed her asylum application while she was in nonimmigrant status, and that nonimmigrant status expired while the asylum application was pending. Her asylum application was then referred to the Immigration Court well before she applied for adjustment of status. We find that, in these circumstances, she has failed to continuously maintain a lawful status since her entry, and that this failure was not "for technical reasons" within the meaning of the statute or regulations.

Our holding is narrow and limited to the factual scenario at issue in this case. In particular, our decision relates only to those situations in which an asylum application was filed while the alien was in nonimmigrant status, the nonimmigrant status subsequently expired, and the asylum application was referred to the Immigration Court by the DHS prior to the time the alien applied for adjustment of status. Moreover, we point out that our decision does not impact those aliens who are not subject to the section 245(c) restrictions—for instance, aliens who seek adjustment of status as immediate relatives or special immigrants, or aliens who can qualify for section 245(i) adjustment notwithstanding the section 245(c) restrictions. Sections 245(c), (i) of the Act; 8 C.F.R. §§ 1245.1(b)(5), (6), 1245.10. The DHS appeal in this regard will therefore be sustained.

## II. RESPONDENT'S APPEAL OF THE IMMIGRATION JUDGE'S JULY 16, 1999, DECISION

We turn, then, to the issues that were pending before the Board at the time this matter was remanded to the Immigration Court in 2002. The respondent had appealed from the Immigration Judge's denial of her applications for asylum and withholding of deportation. She claimed that she was persecuted in the past in Ukraine, and faced future persecution there, on account of her Evangelical Christian religion. The Immigration Judge concluded that the respondent did not meet her burden of proof because she failed to submit adequate corroborative evidence that she was a practicing Evangelical Christian while she was living in Ukraine. We disagree.[9]

The Immigration Judge made no finding that the respondent's testimony was not credible. A review of the record reflects that her testimony was consistent as to all material aspects, including her assertion that she was an Evangelical Christian, as were her parents. *See Matter of S-A-*, 22 I&N Dec. 1328 (BIA 2000); *Matter of A-S-*, 21 I&N Dec. 1106 (BIA 1998); *cf. Diallo v. INS*, 232 F.3d 279, 288 (2d Cir. 2000) (holding that it is inappropriate to base an adverse credibility finding solely on the failure to provide corroboration).

---

[9] Our review is de novo because the appeal in this case was filed prior to September 25, 2002. *See* 8 C.F.R. § 1003.3(f) (2004).

Moreover, the respondent's testimony regarding her status as an Evangelical Christian who held prayer meetings in her home was corroborated by another witness, who also experienced an attack there.

We find, upon crediting the respondent's testimony, that the harm she suffered, primarily as a result of a series of home invasions during which she was seriously injured, was on account of her religious beliefs and practices, and that it rose to the level of persecution under the standard articulated in *Matter of O-Z- & I-Z-*, 22 I&N Dec. 23 (BIA 1998). We therefore conclude that the respondent suffered past persecution and is entitled to the resulting regulatory presumption that she has a well-founded fear of future persecution if she must return to Ukraine. 8 C.F.R. § 1208.13(b)(1) (2004). Since the persecutive events occurred more than a decade ago and the Immigration Judge's decision was rendered more than 5 years past, we will remand the record for the limited purpose of determining whether the DHS can establish fundamentally changed circumstances in Ukraine, including the possibility of internal relocation, that would overcome the presumption of a well-founded fear of future persecution. 8 C.F.R. §§ 1208.13(b)(1)(i)(A)-(B), (ii).[10] Accordingly, the record will be remanded.

**ORDER:** The appeal of the Department of Homeland Security is sustained.

**FURTHER ORDER:** The Immigration Judge's September 27, 2002, decision granting the respondent adjustment of status is vacated, and the record is remanded to the Immigration Court for further proceedings consistent with the foregoing opinion, and for the entry of a new decision.

---

[10] The most recent Department of State report relating to conditions in Ukraine, of which we take administrative notice, shows some improvement in the tolerance for minority religions there, but not such dramatic change as to permit us to conclude, on the basis of that evidence alone, that the presumption of a well-founded fear has been rebutted. Bureau of Democracy, Human Rights, and Labor, U.S. Dep't of State, *Ukraine Country Reports on Human Rights Practices - 2003* (Feb. 2004), *available at* http://www.state.gov/g/drl/rls/hrrpt/2003/27871.htm; *Yang v. McElroy*, 277 F.3d 158 (2d Cir. 2002). The respondent also testified that she could not relocate from her relatively small city because of the propiska law that required persons to remain in the place where they are registered. On remand, the parties may explore whether the propiska system remains intact, or whether the respondent, upon returning to Ukraine, could reside safely in the same city.