# United States Court of Appeals
## For the First Circuit

No. 04-2175

ARTUR BOCOVA,
Petitioner,

v.

ALBERTO GONZALES, ATTORNEY GENERAL,
Respondent.

PETITION FOR REVIEW OF A FINAL ORDER

OF THE BOARD OF IMMIGRATION APPEALS

Before

Selya, Circuit Judge,
Coffin, Senior Circuit Judge,
and Howard, Circuit Judge.

Ilana Greenstein, with whom Harvey Kaplan, Maureen O'Sullivan, Jeremiah Friedman, and Kaplan, O'Sullivan & Friedman, LLP were on brief, for petitioner.
Beth Werlin for American Immigration Law Foundation, amicus curiae.
John Andre, Senior Litigation Counsel, Office of Immigration Litigation, Civil Division, United States Department of Justice, with whom Peter D. Keisler, Assistant Attorney General, and Donald E. Keener, Deputy Director, Office of Immigration Litigation, were on brief, for respondent.

June 24, 2005

**SELYA**, <u>Circuit Judge</u>.  In this case, the Board of Immigration Appeals (BIA) denied the petitioner's alternative application for asylum or withholding of removal, but granted a time-limited privilege of voluntary departure (now seemingly expired).  The first, and easier, question is whether substantial evidence in the record supports the BIA's decision on the merits.  The second, and more difficult, question concerns the extent of our own authority to fashion a new period of voluntary departure, reinstate a lapsed period, or suspend the running of an unexpired period.  This court has not spoken definitively to this multi-part question since the passage of the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA).

On the first issue, we hold that the BIA's decision to deny both asylum and withholding of removal is supported by substantial evidence and, thus, the BIA's final order of removal must stand.  On the second issue, we hold that we lack the authority either to fashion a new period of voluntary departure or to reinstate an expired period of voluntary departure.  We nonetheless conclude that we possess the power, on a timely and properly focused motion, to suspend the running of an unexpired voluntary departure period.  Because the petitioner's motion fails to satisfy these requirements, we deny that relief as well.

## I. BACKGROUND

For simplicity's sake, we rehearse the facts as recounted by the petitioner. We then map the travel of the case.

### A. **The Facts**.

The petitioner, Artur Bocova, is an Albanian national. In 1992, he became an active member of the Albanian Democratic Party (ADP). He attended numerous meetings and rallies and participated in an array of protests. During one such demonstration, which occurred on August 28, 1998, the Albanian police arrested the petitioner and several fellow protesters. He was held without charges for two days, interrogated, beaten, and threatened with death if he did not renounce the ADP. Following his release, he remained active in the party of his choosing.

More than two years passed without incident. Then, on October 14, 2000, the police again arrested the petitioner, this time at a boisterous ADP rally. They apparently recognized him because they remarked that he had not learned his lesson as a result of his earlier detention. The police beat him (this time with chains attached to plastic pipes) and again threatened to kill him if he did not sever his ties to the ADP. The beating caused the petitioner to lose consciousness and prompted the police to take him to a hospital. He was unable to work for two days.

The petitioner remained in Albania and continued to participate overtly in ADP activities. He consulted a lawyer about

the efficacy of filing charges against the police officers who had beaten him. The lawyer discouraged pursuing that course because doing so might incite the police to further acts of violence.

In December of 2000, the petitioner, using a fraudulent Greek passport, left Albania for Greece. He resided in Athens with his uncle for approximately four months. In early 2001, the Albanian police came looking for him at his parents' home; when informed that he was not there, a policeman reportedly replied, "tell him not to come back here any more."

The petitioner continued to worry about his safety because of Greece's proximity to Albania. He therefore decided to leave Greece with nine other aliens, using ersatz documentation. The group traveled through the Netherlands, Venezuela, Ecuador, and Mexico; on April 24, 2001, they sneaked across the border, near Tijuana, with the help of smugglers. The petitioner then wended his way to Boston.

## B. Procedural History.

The petitioner applied for asylum on April 13, 2002. Shortly thereafter, the government initiated removal proceedings against him, charging that he was present in the United States without legal sanction. See 8 U.S.C. §§ 1182(a)(6)(A)(i), 1182(a)(7)(A)(i). At a preliminary hearing before an immigration judge (IJ), the petitioner conceded removability and cross-applied for asylum or withholding of removal. The IJ convened an

-4-

evidentiary hearing on January 10, 2003. After both sides had rested, she denied the petitioner's requests for relief and ordered his removal. Concomitantly, she granted him a sixty-day period within which to depart voluntarily from the United States.

The petitioner appealed. The BIA affirmed the IJ's decision on June 16, 2004, and granted the petitioner a fresh thirty-day voluntary departure period. Due to a technical snafu, the BIA reissued its decision on August 3, 2004; thus, the voluntary departure period began to run on that date.

On September 1, 2004 (one day before his voluntary departure period was due to end), the petitioner filed a petition for judicial review of the BIA's decision and a motion for a stay of removal. The government notified this court of its election not to oppose a stay of removal. Consequently, we issued the stay on October 5, 2004.

On November 19, 2004, the petitioner moved to stay the running of his then-expired voluntary departure period. The government objected. We granted a provisional stay pendente lite, deferring a final disposition of the motion to the merits panel. We also directed the parties to address in their briefs whether the courts of appeals possess the authority to fashion, reinstate, or stay periods of voluntary departure and, if so, under what conditions. The parties faithfully complied with this directive

-5-

and the American Immigration Law Foundation filed a helpful friend-of-the-court brief.

## II. THE MERITS

We turn first to the petition for judicial review. We focus on the petitioner's asylum claim because a claim for withholding of removal "places a more stringent burden of proof on an alien than does a counterpart claim for asylum." Rodriguez-Ramirez v. Ashcroft, 398 F.3d 120, 123 (1st Cir. 2005) (citing Makhoul v. Ashcroft, 387 F.3d 75, 82 (1st Cir. 2004)). Thus, if the petitioner's asylum claim fails on the merits, his counterpart claim for withholding of removal fails as well. See id.

In evaluating the BIA's denial of asylum, our review is aimed at determining whether the agency's decision is supported by substantial evidence in the record. Da Silva v. Ashcroft, 394 F.3d 1, 4 (1st Cir. 2005). Under that regime, we must accept the BIA's findings of fact, including credibility determinations, as long as they are "supported by reasonable, substantial, and probative evidence on the record considered as a whole." INS v. Elias-Zacarias, 502 U.S. 478, 481 (1992). The substantial evidence standard is not petitioner-friendly; under it, the BIA's fact-based determination of an alien's entitlement to asylum must be upheld unless "any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). In other words, vacatur requires that the evidence "point[] unerringly in the

-6-

opposite direction."  Laurent v. Ashcroft, 359 F.3d 59, 64 (1st Cir. 2004).

Rulings of law engender de novo review.  Da Silva, 394 F.3d at 5.  Even in that realm, however, courts must defer to the BIA's reasonable interpretations of the statutes and regulations relating directly to immigration matters.  See INS v. Aguirre-Aguirre, 526 U.S. 415, 425 (1999); Lattab v. Ashcroft, 384 F.3d 8, 17 (1st Cir. 2004).

To qualify for asylum, an applicant bears the burden of establishing that he is a "refugee" within the meaning of the Immigration and Nationality Act (INA).  See 8 U.S.C. § 1158(b)(1); see also Makhoul, 387 F.3d at 79.  An applicant can carry this burden either by proving past persecution on account of race, religion, nationality, membership in a particular social group, or political opinion, or by demonstrating a well-founded fear of future persecution on account of one of these five grounds.  See 8 U.S.C. § 1101(a)(42)(A); 8 C.F.R. § 208.13(b); see also Makhoul, 387 F.3d at 79.  An alien must satisfy both a subjective and an objective test in order to prove a well-founded fear of future persecution.  "That is to say, the asylum applicant's fear must be both genuine and objectively reasonable."  Aguilar-Solis v. INS, 168 F.3d 565, 572 (1st Cir. 1999).

In this instance, the IJ found the petitioner's testimony credible and the BIA accepted that finding.  We therefore proceed

on the assumption that the Albanian police twice arrested, beat, and threatened the petitioner and that this mistreatment was on account of his political opinion (i.e., his membership in the ADP — a party that was then out of favor). Accordingly, the question reduces to whether, given those facts, the BIA was compelled, as a matter of law, to find that the petitioner had established either past persecution or a well-founded fear of future persecution.

Persecution is a protean word, capable of many meanings. Cf. United States v. Romain, 393 F.3d 63, 74 (1st Cir. 2004) (explaining that some "words are like chameleons" in that they may "have different shades of meaning depending upon the circumstances"). Because the word "persecution" is not defined by statute, it is in the first instance the prerogative of the Attorney General, acting through the BIA, to give content to it. See Aguirre-Aguirre, 526 U.S. at 424. We are thus bound to accept the BIA's view of what constitutes persecution unless that view amounts to an unreasonable reading of the statute or inexplicably departs from the BIA's earlier pronouncements. Davila-Bardales v. INS, 27 F.3d 1, 5 (1st Cir. 1994).

For the most part, the BIA has eschewed the articulation of rigid rules for determining when mistreatment sinks to the level of persecution, preferring instead to treat the issue on an ad hoc, case-by-case basis. See, e.g., In re L— K—, 23 I. & N. Dec. 677, 683 (BIA 2004); In re O— Z— & I— Z—, 22 I. & N. Dec. 23, 25-26 (BIA

1998). That is a legitimate praxis. See SEC v. Chenery Corp., 332 U.S. 194, 202-03 (1947) (holding that agencies may implement statutes that they administer case-by-case). Indeed, given the nearly infinite diversity of factual circumstances in which asylum claims arise, it would be difficult to develop meaningful generalities that could easily be applied to a broad spectrum of cases. See Aguilar-Solis, 168 F.3d at 569-70.

That the BIA has chosen to take each case as it comes in deciding whether an alien has demonstrated persecution does not mean that we are left without any guidance. We have held that mistreatment ordinarily must entail more than sporadic abuse in order to constitute persecution. See Nelson v. INS, 232 F.3d 258, 263 (1st Cir. 2000) (explaining that "unpleasantness, harassment, and even basic suffering" are not enough). By the same token, mistreatment can constitute persecution even though it does not embody a direct and unremitting threat to life or freedom. See Aguilar-Solis, 168 F.3d at 569-70. An important factor in determining where a specific case falls along this continuum is whether the mistreatment can be said to be systematic rather than reflective of a series of isolated incidents. See O— Z— & I— Z—, 22 I. & N. Dec. at 26. We consistently have upheld this gloss as a legitimate reading of the INA. See, e.g., Rodriguez-Ramirez, 398 F.3d at 124; Nelson, 232 F.3d at 263-64.

Although we neither condone nor minimize the mistreatment described by the petitioner, we do not feel free to second-guess the BIA's determination that it fell short of establishing past persecution. While any beating at the hands of the police is one beating too many, the record here shows only two incidents, over an eight-year span, occurring more than twenty-five months apart. The first confrontation was relatively minor. Although the second was more severe, there is little in the record to suggest that the petitioner was systematically targeted for abuse on account of his political beliefs.

We add, moreover, that on these facts, the BIA's rejection of the petitioner's claim of past persecution is consistent with other cases presenting comparable facts, in which courts — including this court — have upheld denials of asylum. See, e.g., Gishta v. Gonzales, 404 F.3d 972, 978-80 (6th Cir. 2005) (finding supportable the BIA's determination that members of the ADP who suffered sporadic beatings and jailings had not demonstrated past persecution); Dandan v. Ashcroft, 339 F.3d 567, 573-74 (7th Cir. 2003) (upholding a finding of no persecution despite a serious beating and a three-day detention); Guzman v. INS, 327 F.3d 11, 15-16 (1st Cir. 2003) (affirming the BIA's determination that a serious beating did not amount to persecution). Although we, if writing on a pristine page, might have decided the question differently, we are constrained by the

-10-

standard of review: the evidence is not conclusive either way and, thus, a reasonable adjudicator would not be compelled to reach a particular conclusion. We therefore find that the BIA's determination — that the petitioner was not subject to past persecution — is sufficiently supported by the record. See 8 U.S.C. § 1252(b)(4)(B); see also Elias-Zacarias, 502 U.S. at 481; Laurent, 359 F.3d at 64.

That leaves the likelihood of future persecution should the petitioner be deported to Albania. As to this facet of the asylum analysis, the petitioner's only evidence — apart from the past indignities mentioned above — is his hearsay account of the police officers' visit to his parents' home after he had left the country. When the police were informed that the petitioner had departed, they reportedly replied that his parents should "tell him not to come back here." The BIA deemed this cryptic comment insufficient to establish a well-founded fear of future persecution and that conclusion is readily sustainable.

The short of it is that there are a multitude of possible explanations for the officers' visit. And even if we were to assume, without a scintilla of evidence, that the petitioner's political beliefs sparked the visit — an inference that the BIA declined to draw — that assumed fact would not compel a finding that the visit gave rise to an objectively reasonable fear of future persecution. See, e.g., Flores-Castro v. INS, No. 98-71136,

-11-

2000 WL 1335524, at *1 (9th Cir. Sept. 14, 2000) (upholding a finding that an alien had not established a reasonable fear of future persecution based on a visit by the police to his mother's house, in which the police had made no specific threats); Milosevic v. INS, 18 F.3d 366, 371 (7th Cir. 1994) (agreeing that petitioner had not established a well-founded fear of future persecution based on a visit to his wife's house in which the police asked for the petitioner); cf. Makhoul, 387 F.3d at 81-82 (refusing to set aside the BIA's conclusion that the petitioner had failed to show a reasonable fear of future prosecution based on the arrest of one of his compatriots). To cinch matters, the petitioner has given us no reason to question the BIA's determination that, in Albania today, there is no pattern of persecution of similarly situated persons, such that the petitioner reasonably could expect to be persecuted upon his return.

Simply put, there is no principled basis on which we may set aside the BIA's conclusion that the petitioner failed to establish either past persecution or a well-founded fear of future persecution. This holding also dooms the petitioner's counterpart claim for withholding of removal. See Rodriguez-Ramirez, 398 F.3d at 123. Accordingly, we must deny the petition for review.

## III.  VOLUNTARY DEPARTURE

Having concluded that the removal order must be sustained, we now address the matter of voluntary departure.

-12-

We start with first principles. Voluntary departure is a discretionary form of relief that allows an alien who is subject to a deportation order a period of time in which to leave the country of his own volition. If adhered to, voluntary departure produces a win-win situation. It benefits the government by expediting departures and eliminating the costs associated with deportation. See Rife v. Ashcroft, 374 F.3d 606, 614 (8th Cir. 2004). It benefits the alien because it allows him to choose the destination to which he will travel and to avoid the penalties attendant to removal (thereby easing a possible return to the United States).[1] See id. Voluntary departure, however, is not a one-way street: its benefits come with attendant responsibilities. An alien who fails to leave the country within the allotted departure period faces sanctions, including forfeiture of the required bond, a fine of up to $5,000, and a ten-year period of ineligibility for certain forms of relief under the INA. See 8 U.S.C. § 1229c(a)(3), (b)(3), (d); see also Lopez-Chavez v. Ashcroft, 383 F.3d 650, 651 (7th Cir. 2004).

In this case, the IJ and the BIA each granted the petitioner a period of voluntary departure. The petitioner

---

[1]An alien who has departed the United States while under an outstanding order of removal is ineligible for readmission to the United States for a period of either five or ten years, depending on the circumstances, without the Attorney General's consent. 8 U.S.C. § 1182(a)(9)(A). An alien who departs pursuant to a grant of voluntary departure avoids this disability. Lopez-Chavez v. Ashcroft, 383 F.3d 650, 651 (7th Cir. 2004).

-13-

maintains that we may reinstate the last of these voluntary departure periods in toto, so that he will have thirty days from the date of our mandate within which to leave the United States on his own initiative. Alternatively, he argues that we have authority to stay the voluntary departure period previously granted by the BIA, so that it does not run during our consideration of his petition for review and resumes only upon issuance of our mandate.

Before the effective date of the IIRIRA, this court's practice was to reinstate voluntary departure privileges in appropriate cases. See Umanzor-Alvarado v. INS, 896 F.2d 14, 16 (1st Cir. 1990) (Breyer, J.). The IIRIRA materially changed the ground rules for voluntary departure by stripping the courts of appeals of jurisdiction to review BIA decisions as to whether to grant voluntary departure and, if so, for how long. See 8 U.S.C. §§ 1229c(f), 1252(a)(2)(B)(i). We have not heretofore determined the viability of our authority to reinstate a period of voluntary departure in a post-IIRIRA world. We do so today.

Two of our post-IIRIRA opinions (both involving the same alien) furnish useful background. In Khalil v. Ashcroft, 337 F.3d 50 (1st Cir. 2003) (Khalil I), we followed our historic practice and reinstated the petitioner's voluntary departure period without considering the IIRIRA's effect on our authority to do so.[2] Id. at

_____

[2]So too Velasquez v. Ashcroft, 342 F.3d 55, 59 (1st Cir. 2003), in which a panel of this court reinstated a voluntary departure period in reliance on Khalil I, but without directly

-14-

56. Khalil chose not to quit while he was ahead and overstayed his freshly minted voluntary departure period. We were then faced with the question, inter alia, of whether our reinstatement of the voluntary departure period functioned retroactively to forgive his disregard of the voluntary departure deadline originally set by the BIA. We concluded that the reinstatement did not so operate, but declined to address the government's argument that the reinstatement itself was a nullity because the court had no authority to grant such relief. Khalil v. Ashcroft, 370 F.3d 176, 177, 179-80 (1st Cir. 2004) (Khalil II). We nonetheless acknowledged the issue as open to future consideration and advised the immigration bar to take pains to protect whatever rights aliens might have to preserve voluntary departure privileges. See id. at 182.

The instant case brings us face to face with the question alluded to, but left unanswered, in Khalil II. We must explore whether we retain the authority, after the effective date of the IIRIRA, to reinstate or suspend a previously granted voluntary departure period.[3]

---

examining either the impact of the IIRIRA or the court's continuing authority to reinstate voluntary departure orders.

[3]Congress enacted the IIRIRA on September 30, 1996, to take effect on April 1, 1997. See Illegal Immigration Reform and Immigrant Responsibility Act, Pub. L. No. 104-208, §309, 110 Stat. 3009-546, 3009-625 (1996).

-15-

The matter of reinstatement is open and shut. All of the courts of appeals to resolve the issue thus far have concluded that they no longer may reinstate expired periods of voluntary departure. See Mullai v. Ashcroft, 385 F.3d 635, 639-40 (6th Cir. 2004); Rife, 374 F.3d at 616; Ngarurih v. Ashcroft, 371 F.3d 182, 192-93 (4th Cir. 2004); Reynoso-Lopez v. Ashcroft, 369 F.3d 275, 280-81 (3d Cir. 2004); Sviridov v. Ashcroft, 358 F.3d 722, 731 (10th Cir. 2004); Zazueta-Carrillo v. Ashcroft, 322 F.3d 1166, 1174 (9th Cir. 2003). We agree with these decisions and hold that we no longer have the authority, at the conclusion of judicial review, either to fashion a new voluntary departure period or to reinstate an expired one.

Our reasoning is straightforward. The IIRIRA worked a sea change in the federal courts' authority over voluntary departure orders by withdrawing from the courts jurisdiction to review grants or denials of voluntary departure. See 8 U.S.C. §§ 1229c(f), 1252(a)(2)(B)(i). It also relegated to the Attorney General the sole authority to determine the length of a voluntary departure period, including any extensions thereof. See id. § 1252(a)(2)(B)(i). Reinstating an expired voluntary departure period is functionally equivalent to fashioning a new voluntary departure period; doing so would require the court to dictate both the length of the period and the time when it would begin to run (thus effectively overriding the Attorney General's decision). See

-16-

Mullai, 385 F.3d at 640; Zazueta-Carrillo, 322 F.3d at 1172-73. That would be an impermissible circumvention of Congress's will. Consequently, we disclaim the existence of any such authority and, to that extent, we expressly abrogate our earlier decisions in Umanzor-Alvarado, Khalil I, Velasquez, and similar cases.

There remains the petitioner's alternative argument that we may stay a voluntary departure period previously granted by the BIA pending judicial review of a removal order. On this issue, our sister circuits are divided. Four of them have held that the courts of appeals have the power to toll the running of a voluntary departure period previously granted by the BIA. See Lopez-Chavez, 383 F.3d at 654; Rife, 374 F.3d at 616; Nwakanma v. Ashcroft, 352 F.3d 325, 327 (6th Cir. 2003); El Himri v. Ashcroft, 344 F.3d 1261, 1262 (9th Cir. 2003). The Fourth Circuit has concluded that the courts of appeals lack any such authority. Ngarurih, 371 F.3d at 194. For the reasons that follow, we subscribe to the majority view and hold that, post-IIRIRA, the courts of appeals retain the power to suspend a period of voluntary departure (and, thus, to toll the running of the period).

Our analysis derives principally from the statutory scheme. What we view to be the controlling statute, 8 U.S.C. § 1252, makes judicial review of all final orders of removal subject to the provisions of the Administrative Orders Review Act (better known as the Hobbs Act), 28 U.S.C. §§ 2341-2351. A key provision

of the Hobbs Act declares that "the court of appeals in its discretion may restrain or suspend, in whole or in part, the operation of the order pending the final hearing and determination of the petition." Id. § 2349(b). We regard this language as authorizing courts of appeals, in immigration cases, to suspend (that is, to stay) the running of unexpired voluntary departure periods. Accord Rife, 374 F.3d at 615-16; El Himri, 344 F.3d at 1262 (adopting concurring opinion of Berzon, J., in Zazueta-Carrillo, 322 F.3d at 1177).

We do not find any language in the IIRIRA itself that limits our authority to suspend the running of an unexpired voluntary departure period. Although the IIRIRA eliminated our jurisdiction to review the BIA's decisions granting or denying voluntary departure, see 8 U.S.C. §§ 1229c(f), 1252(a)(2)(B)(i), there is a meaningful distinction between reviewing a grant or denial of voluntary departure (which entails testing the order's substantive validity) and suspending the running of a voluntary departure period granted by the agency (which entails staying the operation of the order pending judicial review of the validity of the underlying removal decision). See Lopez-Chavez, 383 F.3d at 652; Rife, 374 F.3d at 615; El Himri, 344 F.3d at 1262.

Given this distinction, we think that if it were Congress's intention to divest the courts of appeals of authority to suspend voluntary departure periods, it would have expressed

-18-

that intention in a much more direct and pointed fashion. Statutory ambiguities ordinarily are to be construed in favor of the alien in the immigration context. See INS v. St. Cyr, 533 U.S. 289, 320 (2001); INS v. Errico, 385 U.S. 214, 225 (1966); Fong Haw Tan v. Phelan, 333 U.S. 6, 10 (1948). Having in mind both that maxim and Congress's conspicuous lack of specificity here, we decline the government's invitation to attempt to tease a jurisdiction-stripping meaning out of the oblique language contained in 8 U.S.C. § 1229c(f) and § 1252(a)(2)(B)(1). See Miller v. French, 530 U.S. 327, 340-41 (2000) (warning that courts should be chary about interpreting statutes to restrict the scope of traditional judicial review absent the "clearest command" or an "inescapable inference to the contrary" (citations and internal quotation marks omitted)); United States v. Green, 407 F.3d 434, 442 (1st Cir. 2005) (explaining that courts interpreting statutes ordinarily should eschew "linguistic contortion[s] to reach a result that Congress could have accomplished much more simply and straightforwardly"). We conclude, therefore, that the statutory provision relied on by the government cannot override the clear grant of authority contained in 28 U.S.C. § 2349(b).

The government has one last arrow in its quiver. It suggests that because 8 U.S.C. § 1252 limits appellate jurisdiction to review of final orders of removal and because an order allowing a period for voluntary departure is not a final order of removal,

-19-

we may not suspend the running of a voluntary departure period. This is sheer persiflage. As a formal matter, orders of removal and grants of voluntary departure are entered as alternate orders that comprise different facets of a single ukase. 8 C.F.R. § 1240.26(d). In other words, they are complementary; the BIA may grant a period of voluntary departure, but if the alien overstays the allotted period, that part of the order effectively disintegrates and the removal component takes effect. Taken to its logical extreme, the government's argument would require us to find that we have no jurisdiction to entertain a petition for review unless and until the petitioner has overstayed his voluntary departure deadline because only then is the removal order actually entered against him. We simply do not believe that Congress contemplated such an odd result.

To sum up, we conclude that we have the authority to suspend the running of an unexpired voluntary departure period while a petition for judicial review is pending. That conclusion, however, raises several related questions as to when and how a motion for a stay must be filed, whether the movant must exhaust administrative remedies before seeking a stay, and what standards should obtain in determining whether to grant a stay.

The courts that have directly addressed the issue have all determined that in order to qualify for a stay, the alien must make a timeous motion, that is, he must so move before the

-20-

voluntary departure period expires. See, e.g., Alimi v. Ashcroft, 391 F.3d 888, 892 (7th Cir. 2004); Mullai, 385 F.3d at 640; Rife, 374 F.3d at 616. But cf. Desta v. Ashcroft, 365 F.3d 741, 745-46 (9th Cir. 2004) (leaving the question open). Beyond that baseline, however, the cases are in some disarray. The Eighth and Ninth Circuits treat a motion to stay removal as implicitly encompassing a request for a stay of voluntary departure. See Rife, 374 F.3d at 616; Desta, 365 F.3d at 745-46. The Seventh Circuit has rejected that view and requires a particularized request for a stay of voluntary departure. See Alimi, 391 F.3d at 892-93.

We agree that an alien must file a motion for a stay before the expiration of the period of voluntary departure allotted by the BIA. Once the voluntary departure period has run its course, a court of appeals lacks the authority to fashion a new one or to reinstate or extend the old one. See text supra; see also Khalil II, 370 F.3d at 180. That holding compels the further conclusion that an expired voluntary departure period cannot be resuscitated retroactively. Khalil II, 370 F.3d at 177. After the period has elapsed, there is nothing to suspend and any court order purporting to toll an expired period of voluntary departure would have the effect of creating a new voluntary departure period. Under the IIRIRA, that is impermissible. See Mullai, 385 F.3d at 640; Lopez-Chavez, 383 F.3d at 652-53.

-21-

We further hold that an alien must ask explicitly for a stay of voluntary departure; a motion that prays only for a stay of removal will not suffice. Several salient considerations counsel in favor of requiring a particularized request for a stay of voluntary departure. Chief among them is the need for both the government and the court to understand exactly what relief the movant is seeking. See Alimi, 391 F.3d at 892-93. The government may (and often does) elect not to oppose a motion for a stay of removal (indeed, it followed that course here). It may, however, choose to oppose a suspension of the voluntary departure period. If every request for a stay of removal were treated as incorporating sub silento a request for a stay of voluntary departure, the government might be far less willing to acquiesce. Requiring the motion to specify what redress the alien seeks allows the government to take an equally explicit position.

Relatedly, we note that stays usually require expedited judicial consideration. The need for celerity makes it imperative that the court know the parties' positions up front. Even though the same basic legal test applies to motions for stays of removal and motions for stays of voluntary departure, see text infra, that test may play out differently as to each type of relief. Given this possibility, requiring the alien to be precise about the relief requested will materially assist the court in conducting its review.

The next problem relates to the need, if any, for exhaustion of administrative remedies. The Seventh Circuit — and only the Seventh Circuit — requires an alien to exhaust administrative remedies (that is, to request an extension of the voluntary departure period from the United States Citizenship and Immigration Services District Director) before seeking a judicial stay of voluntary departure. Alimi, 391 F.3d at 893. We reject this gloss.

In imposing an exhaustion requirement, the Seventh Circuit reasoned that, generally speaking, the law favors exhaustion of available administrative remedies as a condition precedent to seeking judicial assistance and that a voluntary departure order does not require the alien to depart until a future date (thus leaving time to pursue administrative remediation). See id. at 893. We find this reasoning unpersuasive. A suspension of a voluntary departure period merely tolls the running of that period; it does not extend it. Because neither the BIA nor Citizenship and Immigration Services (CIS) appears to have the authority to toll a voluntary departure period pending judicial review,[4] we doubt whether there is any suitable administrative remedy for the alien to exhaust.

---

[4]We are aware of no case in which either the BIA or CIS has granted such a suspension, and the government has brought none to our attention.

Even if such a remedy exists, we fear that, in the majority of cases, requiring an alien to seek an administrative extension would be an exercise in futility. By law, the BIA may fashion a voluntary departure period of no more than sixty days. See 8 U.S.C. § 1229c(b)(2). Certain high-level CIS officials are authorized to extend that period, but they too are bound by the sixty-day maximum; they may only extend the voluntary departure period if the BIA granted less than the maximum voluntary departure time in the first instance. See id. § 1229c(b)(2); 8 C.F.R. § 1240.26(f). A sixty-day interval simply is not enough time, in the ordinary course of events, to permit the docketing, briefing, argument, and decision of a petition for judicial review.

The flip side of the coin reveals an equally unpromising reality. A motion to suspend the running of the voluntary departure period must be made during the currency of that period. See text supra. Given this short shelf life, requiring the alien first to request some evanescent administrative remedy, which the agency may act upon at its leisure, might well sound the death knell for the possibility of a judicial stay. That is too high a price to demand that the alien pay. Cf. Mackey v. Bd. of Educ., 386 F.3d 158, 162 n.3 (2d Cir. 2004) (excusing a litigant's failure to exhaust administrative remedies when the agency's delay could have resulted in the unavailability of the relief sought).

For the foregoing reasons, we conclude that an alien seeking a stay of a previously granted period of voluntary departure must apply for the stay before the expiration of that period and that the motion must explicitly request a stay of the voluntary departure period. The movant need not, however, first apply for an administrative extension of the voluntary departure period.

We turn now to the substantive standards for evaluating a motion to suspend the running of a previously granted voluntary departure period. Mindful of the weight of authority elsewhere, see, e.g., Rife, 374 F.3d at 616; Desta, 365 F.3d at 748, we conclude that we should subject such a motion to scrutiny under the same legal standards used to assess a motion for stay of removal. Those criteria are spelled out in our opinion in Arevalo v. Ashcroft, 344 F.3d 1 (1st Cir. 2003). There, we held that requests for stays of removal should be evaluated under the four-part test applicable to applications for preliminary injunctive relief. Id. at 9. That test requires the alien to show "(1) that she is likely to succeed on the merits of her underlying objection; (2) that she will suffer irreparable harm absent the stay; (3) that this harm outweighs any potential harm fairly attributable to the granting of the stay; and (4) that the stay would not disserve the public interest." Id. at 7.

We add a coda. Although we use the same four-part test for adjudicating motions for stays of removal and motions to suspend the running of voluntary departure periods, the considerations to which the test applies may not be fully congruent. Thus, there may be cases in which an alien is entitled to a stay of removal but not a stay of voluntary departure. See Alimi, 391 F.3d at 892-93 (observing that a stay of voluntary departure may not always be appropriate in cases in which a stay of removal is appropriate); Rife, 374 F.3d at 616 (similar).

At this point, we return to the case at hand. Here, the petitioner did not move to stay the running of the voluntary departure period until well after that period expired. Consequently, we deny his motion.[5] Our earlier order staying the order of removal will remain in effect until mandate issues. See Mariscal-Sandoval v. Ashcroft, 370 F.3d 851, 856 (9th Cir. 2004). During that interval, the petitioner remains free to depart the United States on his own volition and thereby to avoid some (but not all) of the untoward consequences associated with forced removal. See Khalil II, 370 F.3d at 180.

---

[5]If this result seems harsh, we note that we released our opinion in Khalil II on June 3, 2004, well before the BIA decided the petitioner's case. The petitioner plainly was on notice that the issue was in play and easily could have taken precautionary steps to protect his interests.

## IV.  CONCLUSION

We need go no further.  To recapitulate, we deny the petition for review.  We likewise deny the petitioner's hydra-headed request that we fashion a new voluntary departure period, retroactively reinstate his expired voluntary departure period, or treat his motion for a stay of removal as a motion to suspend the march of the voluntary departure period.  While we hold that, in appropriate cases, we possess the authority to suspend the running of an unexpired period of voluntary departure, this is not an appropriate case; an alien must explicitly request that relief before the expiration of the voluntary departure period,[6] and the petitioner has not satisfied that requirement.

**The petition for review and the motion to reinstate or stay a voluntary departure period are denied**.  **The stay of removal and the provisional order anent voluntary departure are revoked**.

---

[6]For the sake of clarity, we add that an alien who desires both a stay of removal and a stay of the running of a previously granted voluntary departure period may incorporate both requests in a single motion.  The motion, however, must be explicit as to the forms of relief requested and must be timely as to each request.