[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
NOVEMBER 21, 2007
THOMAS K. KAHN
CLERK

_____

No. 07-11122
Non-Argument Calendar

_____

BIA No. A95-241-852

JULIJA BOICOVA,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

**(November 21, 2007)**

Before ANDERSON, BARKETT and HULL, Circuit Judges.

PER CURIAM:

Julija Boicova petitions for review of the order by the Board of Immigration Appeals (BIA) affirming the immigration judge's (IJ's) order denying her application for asylum and withholding of removal.[1]  After review, we deny Boicova's petition.

## I.  BACKGROUND

### A.    Boicova's Application and Hearing Testimony

Boicova, a native of Latvia and a citizen of Lithuania, filed an asylum application contending that she was persecuted in Lithuania because of her Russian heritage.  According to Boicova, she was abducted by "the mafia" and sent to Germany to work as a sex slave.  After the German police freed her, Boicova returned to Lithuania and received medical treatment.

Once back in Lithuania, Boicova and her family began to receive death threats from the mafia if she spoke about her abduction.  Boicova went to the police, who refused to protect her because she was Russian speaking.  After a police detective advised Boicova to disappear for a few weeks, Boicova moved to a farm about 60 kilometers from her hometown.  While Boicova was living at the farm, her father was beaten and asked where Boicova could be found.

---

[1]On appeal, Boicova does not challenge the denial of CAT relief.  Consequently, she has abandoned that claim.  See Sepulveda v. U.S Att'y Gen., 401 F.3d 1226, 1228 n.2 (11th Cir. 2005).

Boicova approached a journalist who was doing a story on women and prostitution. Boicova agreed to be interviewed for a television program and described her abduction and the failure of the Lithuanian police to help her. After the program aired, the police detained Boicova for three days, threatened to put her in jail for five years, and released her only after she agreed not to speak about her abduction. Ten days after she was released, a group of men attempted to abduct Boicova, but failed after she screamed and neighbors called the police. She was injured and had to be hospitalized for two weeks.

Approximately three weeks after the abduction attempt, Boicova's door was set on fire. Instead of reporting this incident, Boicova concluded that the police would not help her and decided to leave the country. Boicova claims that her father's business was confiscated and that since her departure her father has received threatening telephone calls asking for her location.

Boicova entered the United States on September 14, 2001 as a nonimmigrant with authorization to remain until March 12, 2002. On March 4, 2002, Boicova filed an application for asylum and withholding of removal.

Boicova also submitted the following documents in support of her application: (1) a medical record from the Mazhekiai Hospital in Lithuania dated May 16, 2001 indicating that Boicova was diagnosed with "having a dug vagina and break vulvas" and told to seek treatment from a family doctor; (2) a medical

3

record from the Mazhekiai Hospital dated August 10, 2001 indicating that Boicova was diagnosed with "multiple bruises of head and trunk" and was referred to a neuropathologist for six months' supervision; (3) a document from the Lithuanian fire department indicating that the door to Boicova's apartment had been set on fire on February 11, 2001; (4) a letter from Boicova's father stating that "the mafia people have come and called to our home several times" asking for Boicova's whereabouts and that he feared for Boicova's safety if she returned to Lithuania; (5) a document entitled Verification re: Employment of Mr. Vladimir Boicov dated November 19, 2003, indicating that Mr. Boicov's forestry and lumbering business was "registered off" on January 23, 2001 because "[d]ue to immense input required for lumbering business and hard lumbering work of four individuals advanced in years, Vladimir Boicov's enterprise could not proceed with contractual works"; and (6) a document from the Vilnuis Chief Police Department stating that a lawsuit had been commenced based on Vladimir Boicov's application "in compliance with Article 140 of the Criminal Code of the Republic of Lithuanians (minor health a disorder) and Article 187 Section 1 of the Criminal Code of the Republic of Lithuanians (deliberate destruction of or damage to property)." These documents were translated into English by a woman named Larisa Sapronova, who also assisted Boicova in preparing her asylum application.

Boicova also relies on the State Department's 2004 Country Report on Human Rights Practices for Lithuania, submitted by the government, which indicates that "trafficking in women and girls for the purpose of sexual exploitation was a problem" and that traffickers targeted young women from ethnic minorities. Traffickers lured young women with deceptive offers of domestic work in Western European countries and then ensured compliance with threats and the withholding of their documents. According to the Country Report, Europol estimated that about 1,200 Lithuanian women are victims of trafficking every year.

Following an asylum interview, Boicova was issued a Notice to Appear, in which she was deemed removable for having remained in the United States for a time longer than permitted, in violation of INA § 237(a)(1)(B), 8 U.S.C. § 1227(a)(1)(B). At her removal hearing, Boicova conceded removability.

Before allowing Boicova to testify, the IJ expressed concerns about certain documents Boicova had submitted. For example, the IJ questioned the validity of one document from the fire department that contained different typesettings.

Boicova then testified about her abduction to Germany, her release by German police and attempts to seek protection upon her return to Lithuania. Boicova's testimony at times was inconsistent with statements made either in her asylum application or her asylum interview. For example, as to her ordeal in Germany, Boicova testified that she was freed by the German police and taken to

5

the Lithuanian embassy. However, in her asylum application, Boicova stated merely that she "managed to escape" from the brothel in Germany. Boicova stated in her asylum interview that she was held captive in Germany for six days before German police freed her and that she was first taken to the police station and the Red Cross before being taken to the Lithuanian embassy. However, at the hearing, Boicova testified that she was held captive in Germany for ten days and taken by the German police directly to the Lithuanian embassy with "[n]o stops." Boicova stated in her asylum interview that she was abducted after she had searched for a job with a company called "ASTRA." However, at the hearing, Boicova testified on direct that the company was called "Obtka" and on cross-examination that the company name was "Optika." In her asylum application, Boicova stated that, while in Germany, she was forced to engage in prostitution. At the hearing, Boicova testified that she did not engage in prostitution in Germany, but that she was raped on three occasions by four Arab guards.

With regard to events after she returned to Lithuania, Boicova testified about the second abduction attempt and the resulting two-week hospitalization. However, Boicova failed to mention this incident in either her asylum application or her asylum interview. At the hearing, Boicova testified that her apartment door was set on fire, but in her asylum application she stated that her "house was burnt." At the hearing, Boicova testified that after her return to Lithuania she relocated to a

6

family friend's farm to avoid threatening phone calls. Boicova stated in her asylum interview that she relocated to her aunt's house. At the hearing, Boicova testified that her father continued to receive threatening phone calls after her departure. In her asylum interview she claimed that "the mafia" had come to her parents' home searching for her after she fled to the United States.

## B.    Decisions from the IJ and the BIA

In her oral decision, the IJ found Boicova "to be totally incredible." In support of his adverse credibility finding, the IJ cited, among other reasons: (1) the questionable authenticity of the fire department report that contained two different typesets; (2) inconsistencies between Boicova's hearing testimony and asylum interview regarding Sapronova's address and the details of Boicova's rescue in Germany; (3) Boicova's failure to give the same level of detail in her application and asylum interview, such as her failure to mention the rape in Germany during her asylum interview; and (4) inconsistencies between Boicova's testimony and the fire department report regarding the date when her apartment door was set on fire.

The IJ noted that in addition to "the numerous discrepancies and/or omissions," Boicova's demeanor during the hearing was suspicious. The IJ indicated that Boicova had been fidgety and nervous throughout the hearing, repeatedly rubbing her legs, playing with a paper or tissue and looking at the floor

during her testimony. The IJ also noted that Boicova had been unresponsive to "a number of questions" during her testimony.

The IJ concluded that, because Boicova's "entire claim [was] totally incredible," Boicova had failed to meet her burden of proof and denied all relief. Boicova appealed to the BIA, which adopted and affirmed the IJ's decision. The BIA noted several examples of inconsistencies cited by the IJ and concluded that the IJ properly discredited Boicova. The BIA also emphasized that Boicova's corroborative evidence was unconvincing. Accordingly, the BIA dismissed Boicova's appeal.

Boicova filed this petition for review.

## II. DISCUSSION

On appeal, Boicova argues that the IJ's credibility finding is not supported by substantial evidence because, although it was specific, it was not cogent, supported by the record or pertinent to the heart of her claim.[2]

An applicant for asylum or withholding of removal may sustain her burden of proof without corroboration, "but only if the applicant satisfies the trier of fact

_____

[2]Where as here the BIA expressly adopts the IJ's decision, we review both the BIA's and IJ's ruling. Al Najjar v. Ashcroft, 257 F.3d 1262, 1284 (11th Cir. 2001). We review factual determinations regarding whether an alien is eligible for asylum or withholding of removal under the substantial evidence test. Id. at 1283-84. Under the substantial evidence test, "we must find that the record not only supports reversal, but compels it." Mendoza v. U. S. Att'y Gen., 327 F.3d 1283, 1287 (11th Cir. 2003). A credibility determination, like any other fact finding, may not be overturned unless the record compels it. Forgue v. U.S. Att'y Gen., 401 F.3d 1282, 1287 (11th Cir. 2005).

8

that the applicant's testimony is credible, is persuasive, and refers to specific facts sufficient to demonstrate that the applicant is a refugee." INA §§ 208(b)(1)(B)(ii), 241(b)(3)(C), 8 U.S.C. §§ 1158(b)(1)(B)(ii), 1231(b)(3)(C). On the other hand, a denial of relief "can be supported solely by an adverse credibility determination, especially if the alien fails to produce corroborating evidence." Chen v. U.S. Att'y Gen., 463 F.3d 1228, 1231 (11th Cir. 2006).

The IJ must make an explicit credibility determination and offer "specific, cogent reasons for the finding." Id. If the IJ has made an explicit credibility finding, the alien bears the burden to show that the finding is not supported by "specific, cogent reasons" or is not supported by substantial evidence. Id.

Here, the IJ's reasons for discrediting Boicova were specific, cogent and supported by substantial evidence. The IJ listed numerous inconsistencies between Boicova's testimony and her asylum application and her asylum interview. Many of the inconsistencies relate directly to Boicova's claim that she was persecuted, including events she claims occurred in Lithuania after she returned from Germany, such as her attempt to relocate, the second abduction attempt and the fire at her home. The documentation Boicova submitted is insufficient to compel a conclusion that Boicova is credible or that, without her testimony, she suffered persecution.

9

Accordingly, substantial evidence supports the determination by the IJ and the BIA that Boicova failed to carry her burden of proving her status as a refugee for asylum purposes. Because Boicova failed to establish eligibility for asylum, she likewise has failed to show that she is eligible for withholding of removal. See Al Najjar v. Ashcroft, 257 F.3d 1262, 1292-93 (11th Cir. 2001).[3]

**PETITION DENIED.**

---

[3]Boicova alternatively requests that the Court reinstate her period for voluntary departure, which has expired. We lack jurisdiction to do so. See Nkacoang v. INS, 83 F.3d 353, 356-57 (11th Cir. 1996); Bocova v. Gonzales, 412 F.3d 257, 267-68 (1st Cir. 2005).