# United States Court of Appeals

## For the First Circuit

No. 05-2782

ADIL CHEDAD,

Petitioner,

v.

ALBERTO R. GONZALES, Attorney General,

Respondent.

ON PETITION FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS

Before

Selya, Lipez, and Howard, Circuit Judges.

Saher J. Macarius, with whom Law Offices of Saher J. Macarius, was on brief for petitioner.

Manuel A. Palau, Trial Attorney, Civil Division, United States Department of Justice, with whom Peter D. Keisler, Assistant Attorney General, and Terri J. Scadron, Assistant Director, were on brief, for respondent.

Nadine Wettstein and Matthew Downer, on brief for amicus curiae American Immigration Law Foundation.

July 31, 2007

**HOWARD**, <u>Circuit Judge</u>.  Adil Chedad petitions for review of a decision of the Board of Immigration Appeals ("BIA") upholding the order of an Immigration Judge ("IJ") pretermitting his application for adjustment of status and declaring him removable from the United States.  The basis of the IJ's decision, and its affirmance, was that Chedad was ineligible for any such adjustment because he had overstayed a period of voluntary departure imposed as part of a prior BIA order closing the removal proceedings against him.[1]  Before the voluntary departure period lapsed, however, Chedad had filed a motion with the BIA to reopen those proceedings due to previously unavailable evidence.

The BIA granted the motion to reopen and remanded the matter to the IJ, who, as just noted, deemed Chedad ineligible for any further relief because he had disobeyed the voluntary departure order.  Chedad argues that the BIA erroneously affirmed the IJ's ruling, either because the filing of his motion to reopen tolled the running of the voluntary departure period, or because the BIA's allowance of the motion stripped the voluntary departure order of any legal significance.  We deny Chedad's petition for review.

---

[1]    The Immigration and Nationality Act ("the INA") provides a mechanism for an alien, subject to the discretion of the Attorney General and other limitations, "to depart the United States voluntarily at his own expense" in lieu of continued participation in removal proceedings.  8 U.S.C. §§ 1229c(a)(1), (b)(1) (2005).

The Immigration and Naturalization Service ("INS") commenced removal proceedings against Chedad, a native of Morocco, in 1997, asserting that he had remained in the United States beyond the time permitted by the six-month nonimmigrant visa issued to him in 1994.[2] Chedad appeared before the IJ with counsel on May 28, 1998 and admitted overstaying his visa. He also requested a continuance of the proceedings on the ground that his wife, Joanne S. Francisco--a lawful permanent resident of the United States--had filed an application for citizenship, as well as a visa application on Chedad's behalf, known as an I-130 petition. See 8 U.S.C. § 1154(a)(1)(B)(i); 8 C.F.R. § 204.1(a)(1) (2006).[3] If Francisco became a naturalized citizen of the United States, then Chedad would become immediately eligible to apply for adjustment of status to that of an alien admitted for lawful permanent residence. See 8 U.S.C. § 1151(b)(2)(A)(i). The IJ therefore granted Chedad's motion for a continuance to allow the processing of his spouse's applications. Chedad later received a second continuance for that

---

[2]    In March 2003, the INS was abolished and its functions were transferred to the newly formed Department of Homeland Security. See Homeland Security Act of 2002, Pub. L. No. 107-296, §§ 451(b) and 471(a), 116 Stat. 2135, 2195 and 2205, codified at 6 U.S.C. §§ 271(b) and 291(a) (Supp. 2006). For consistency, we will refer to the responsible agency as "the INS" throughout our opinion.

[3]    Since Chedad's proceedings before the BIA, many of its regulations have been recodified without changing their substance. For purposes of clarity, we will cite to the applicable regulations as currently codified.

purpose. Meanwhile, Francisco's I-130 petition on Chedad's behalf was approved on October 21, 1998.

Francisco's application for naturalization was still pending when removal proceedings against Chedad resumed on March 4, 1999. Though Chedad sought another continuance on that ground, the IJ refused, giving him the choice between the entry of a final order of removal and an opportunity to seek voluntary departure. Id. § 1229c(b). Chedad elected voluntary departure and received a continuance so that he could obtain a valid travel document for the purpose of leaving the country.

When Chedad reappeared before the IJ on June 11, 1999, he again moved for a continuance to allow the processing of his wife's application for citizenship; the IJ again denied the motion. Instead, the IJ granted Chedad's motion for voluntary departure, requiring him to leave in sixty days. Id. § 1229c(b)(2). The IJ also warned Chedad of the consequences of disobeying the voluntary departure order, including the loss of the opportunity to pursue adjustment of immigration status through several different avenues for a period of ten years. Id. § 1229c(d)(1) (Supp. 2006).[4]

---

[4]    In 2006, Congress amended 8 U.S.C. § 1229c(d) through the Violence Against Women and Department of Justice Reauthorization Act of 2005. Pub. L. No. 109-162 § 812, 119 Stat. 2960, 3057 (2006). This amendment, in relevant part, renumbered the penalty provision of § 1229c(d) as § 1229c(d)(1). For purposes of clarity, we will cite to the current subsection number throughout our opinion.

Chedad appealed the IJ's denial of his final motion for a continuance to the BIA. During the pendency of the appeal, on May 24, 2001, Francisco completed the naturalization process. On July 15, 2002, with the appeal still pending, Chedad filed a motion to remand with the BIA, citing his newly minted status as the spouse of a United States citizen, as well as the prior approval of his I-130 petition.

The BIA dismissed Chedad's appeal and denied his motion to remand in an order issued on October 25, 2002. First, the BIA ruled that the IJ had not abused her discretion in denying Chedad's final request for a continuance of the removal proceedings. Second, the BIA denied the motion to remand because it was unaccompanied by an application for adjustment of Chedad's status to that of an alien admitted for lawful permanent residence pursuant to 8 U.S.C. § 1255(a), as required by BIA rules. 8 C.F.R. § 1003.2(c)(1). The BIA granted Chedad thirty days from the date of its order to depart the country voluntarily, repeating the IJ's admonition about the consequences of any failure to do so.[5]

On November 22, 2002, before the expiration of the voluntary departure period, Chedad filed a motion with the BIA to reopen the removal proceedings, again asserting that he had become

---

[5]    The execution of the IJ's sixty-day voluntary departure order had been stayed pending Chedad's appeal. See 8 C.F.R. § 1003.6(a). Because thirty days had already expired by the time Chedad filed the appeal, thirty days of voluntary departure time remained at the time of the BIA's decision. See id. § 1240.26(f).

-5-

eligible for adjustment of status under § 1255(a). This filing, made within ninety days of the BIA's decision as required by the INA, 8 U.S.C. § 1229a(7)(C)(1), and its implementing regulations, 8 C.F.R. § 1003.2(c)(2), included the application for adjustment of status and supporting materials that had been omitted from Chedad's earlier motion to remand. Noting that Chedad's motion to reopen "demonstrate[d] that he is now prima facie eligible for adjustment of status," the BIA granted the motion in an order dated February 21, 2003, remanding the case to the IJ "for proceedings consistent with this opinion." The BIA's order made no mention of the voluntary departure requirement previously imposed.

When the proceedings found their way back to the IJ, however, the prior voluntary departure order--which Chedad had not satisfied--proved dispositive. The IJ determined that, because Chedad had failed to leave the United States as required, he had become ineligible for adjustment of status by operation of 8 U.S.C. § 1229c(d). The IJ rejected Chedad's arguments that (1) the BIA had nullified its voluntary departure order by granting his motion to reopen, and (2) the filing of his motion to reopen, on November 22, 2002, had tolled the running of the voluntary departure period. In rejecting these arguments, the IJ relied on Matter of Shaar, 21 I. & N. Dec. 541 (BIA 1996), aff'd, 141 F.3d 953 (9th Cir. 1998), which held that the filing of a motion to reopen does not itself toll the voluntary departure period. The IJ therefore pretermitted

-6-

Chedad's application for adjustment of status and ordered him removed from the United States.

Chedad appealed, repeating the arguments he had made before the IJ. In particular, Chedad noted that Shaar had recently been overruled by the Ninth Circuit, which held that a timely motion to reopen could toll the voluntary departure period. Azarte v. Ashcroft, 394 F.3d 1278, 1289 (9th Cir. 2005). The BIA, however, did not consider itself bound by Azarte, or similar decisions from other circuits, in a case arising within this court's appellate jurisdiction, and therefore rejected Chedad's tolling argument. As to Chedad's contention that the BIA had emasculated its prior voluntary departure order by granting the motion to reopen, the BIA explained that the latter decision "was based solely on the fact that [Chedad] had established prima facie eligibility for relief and not based on [the BIA's] adjudication of the merits of his claim; also, [his] motion had not been opposed by [the INS] so no issues were raised to rebut [his] eligibility for relief." The BIA therefore upheld the IJ's ruling that Chedad was disqualified from seeking adjustment of status based on his disobedience of the voluntary departure order--a fact that had not been considered by the BIA in previously deciding to remand the case. Chedad then petitioned this court for review.

In his petition, Chedad argues that the BIA mistakenly upheld the IJ's reliance on the voluntary departure order as a

basis for disqualifying him from further relief. We have jurisdiction over such a petition under 8 U.S.C. § 1252(a)(1), which provides for "review of a final order of removal," notwithstanding the jurisdiction-stripping provision of § 1252(a)(2)(B)(i). DaCosta v. Gonzales, 449 F.3d 45, 49 (1st Cir. 2005) (exercising jurisdiction over BIA's ruling that violation of voluntary departure order rendered alien ineligible for adjustment of status because BIA did not reach merits of adjustment claim).

Chedad contends that the BIA erred in refusing to treat (1) the filing of his motion to reopen as tolling the voluntary departure period, or (2) the allowance of the motion as depriving the voluntary departure order of its effect. In considering such arguments, "[w]e afford de novo review to the BIA's legal conclusions, but cede some deference to its interpretations of the INA." Da Silva v. Ashcroft, 394 F.3d 1, 5 (1st Cir. 2005) (citing INS v. Aguirre-Aguirre, 526 U.S. 415, 425 (1999)).

## II.

Chedad argues that the provisions of the INA authorizing motions to reopen, on the one hand, and voluntary departure, on the other, conflict in such a way as to require the timely filing of the former to toll the running of the latter. This argument has prevailed in a number of circuits, see Ugokwe v. Attorney Gen., 453 F.3d 1325, 1331 (11th Cir. 2006); Kanivets v. Gonzales, 424 F.3d 330, 335 (3d Cir. 2005); Sidikhouya v. Gonzales, 407 F.3d 950, 952

-8-

(8th Cir. 2005); Azarte, 394 F.3d at 1289, but has failed in others, see Dekoladenu v. Gonzales, 459 F.3d 500, 507 (4th Cir. 2006); Banda-Ortiz v. Gonzales, 445 F.3d 387, 391 (5th Cir. 2006). We now consider the question.

The INA's voluntary departure provision plays an important part in the smooth functioning of the country's immigration procedures. See, e.g., DaCosta, 449 F.3d at 50; Bocova v. Gonzales, 412 F.3d 257, 265 (1st Cir. 2005). Subject to a number of qualifications, the Attorney General, at his discretion, may grant an alien's request to depart the United States voluntarily, either in lieu of commencing deportation proceedings or at the conclusion of those proceedings. 8 U.S.C. §§ 1229c(a)(1), (b)(1). From the alien's perspective, voluntary departure offers certain benefits, among them avoiding the penalties attendant to deportation, which include five- or ten-year bars on seeking readmission to the country. Id. §§ 1182(a)(9)(A)(i), (ii); Bocova, 412 F.3d at 265 & n.1. The government also benefits from voluntary departure by "expediting departures and eliminating the costs associated with deportation." Bocova, 412 F.3d at 265.

The INA imposes harsh penalties, however, on aliens who do not live up to their end of the voluntary departure bargain. An alien who "fails voluntarily to depart the United States within the time period specified" receives monetary sanctions and becomes

ineligible for a number of forms of immigration relief, including adjustment of status, for a period of ten years. 8 U.S.C. § 1229c(d)(1). The IJ relied on this provision in pretermitting Chedad's application for adjustment of status based on his wife's naturalization. The INA also strictly limits the time allowable for the alien to leave the United States. In a case, like Chedad's, of voluntary departure ordered at the conclusion of deportation proceedings, the voluntary departure period cannot exceed 60 days.[6] Id. § 1229c(b)(2).

The availability of motions to reopen removal proceedings is also restricted. Id. § 1229a(7). Such motions must be based on material evidence that "was not available and could not have been discovered or presented at the former hearing," including "circumstances that have arisen subsequent to the hearing" which bear on the alien's eligibility for discretionary relief. 8 C.F.R. § 1003.2(c)(1). An alien ordinarily may file only one such motion after the close of proceedings. 8 U.S.C. § 1229a(7)(A). Furthermore, and of particular note here, a motion to reopen "shall be filed within 90 days of the date of an administrative order of removal," subject to certain exceptions inapplicable to Chedad. Id. § 1229a(7)(C)(1).

_____

[6] By contrast, a voluntary departure period granted prior to the end of removal proceedings cannot exceed 120 days. 8 U.S.C. § 1229c(a)(2)(A).

-10-

Those courts holding that a timely motion to reopen suspends the running of the voluntary departure period have perceived a conflict between § 1229a(7)(C)(1), which allows ninety days to file a motion to reopen, and § 1229c(b)(2), which limits voluntary departure granted at the close of removal proceedings to just sixty days. Ugokwe, 453 F.3d at 1331; Kanivets, 424 F.3d at 335; Sidikhouya, 407 F.3d at 952; Azarte, 394 F.3d at 1286. While the motion to reopen had long been recognized in deportation proceedings as a matter of practice and, later, by administrative rulemaking, Congress did not put its imprimatur on the vehicle until the enactment of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRAIRA"), which "provided the [aforementioned] statutory right to a motion to reopen." Azarte, 394 F.3d at 1283 (citing 8 U.S.C. § 1229(c)(6)(A) (1996)). IIRAIRA also, however, "drastically limited the time allowed for voluntary departure," id. at 1285, imposing, inter alia, the sixty-day limitation found at 8 U.S.C. § 1229c(b)(2).

The joint effect of these provisions is practically to foreclose the availability of motions to reopen in most cases where the alien has received voluntary departure. As Azarte observes, even an alien who seeks reopening at the outset of the voluntary departure period has little hope of receiving a decision before the expiration of the departure deadline. 394 F.3d at 1287. If the alien defies the voluntary departure order by remaining in the

-11-

United States pending action on the motion to reopen, the alien will be automatically cut off from a number of avenues of relief by operation of § 1229c(d)(1), including, in many cases, the very relief he or she sought reopening to pursue, i.e., adjustment of status. On the other hand, if the alien complies with the order and leaves, the BIA will treat the motion as withdrawn, also precluding any relief. 8 C.F.R. § 1003.2(d). Azarte and its progeny reason that this "'Catch-22' situation" calls for tolling the voluntary departure period while the alien awaits the BIA's ruling on a timely motion to reopen. Kanivetz, 424 F.3d at 334; see also Ugokwe, 453 F.3d at 1331; Sidikhouya, 407 F.3d at 952.

Though there is some force to this reasoning, we believe that it proceeds from an erroneous premise, namely, that motions to reopen are available only in proceedings where voluntary departure has been granted. Subsection 1229a(7), however, permits "one motion to reopen proceedings under this section," which include all "proceedings for deciding the inadmissibility or deportability of an alien." 8 U.S.C. § 1229a(1)(A). Proceedings where voluntary departure has not been granted, naturally, spawn no "conflict" between the deadline for moving to reopen and the deadline for leaving the country voluntarily.

In our view, holding aliens to the sixty-day limit on voluntary departure imposed by § 1229c(b)(2), despite the ninety-day limit on motions to reopen granted by § 1229a(7)(C)(1), does

-12-

not "deprive[] the motion to reopen provision of meaning by eliminating the availability of such motions to those granted voluntary departure."  Azarte, 394 F.3d at 1288.  Rather, § 1229a(7) has significance for aliens who have not sought the benefits of voluntary departure and can therefore pursue reopening without regard for the sixty-day deadline.[7]  See Dekoladenu, 459 F.3d at 505-06.  We cannot accept Azarte's reasoning that Congress could not have intended to subject motions to reopen to the voluntary departure cutoff because that would "preclude their availability in a significant number of cases, likely a substantial majority."  394 F.3d at 1289; accord Banda-Ortiz, 445 F.3d at 393 (Smith, J., dissenting).  Azarte did not cite any authority for the proposition that voluntary departure is entered in "a substantial majority" of removal proceedings.  In fact, as the Fourth Circuit noted in Dekoladenu, 459 F.3d at 506 n.5, available statistics indicate that voluntary departure was granted in just ten percent

---

[7]    Without disputing this point, the dissent nevertheless joins Azarte in rejecting "the proposition that Congress, while expressly codifying the tradition of motions to reopen, intended sub silentio to preclude their availability" in cases of voluntary departure. 394 F.3d at 1289.  As we explain, however, because our reading of IIRAIRA will preclude (at least as a practical matter) motions to reopen only in the relatively small percentage of cases where aliens elect voluntary departure, we hardly think it "implausible" that Congress intended such a result.  Indeed, we think it considerably less plausible that, despite IIRAIRA's unmistakable purpose in ensuring that voluntary departure in fact results in the alien's leaving the United States in a timely manner, Congress intended to allow an alien to avoid doing so through the simple expedient of filing a motion to reopen.

-13-

of removal cases in 2006, and has never been granted in more than eighteen percent of them in any of the last five years. Executive Office for Immigration Review, FY 2005 Statistical Yearbook Q1 (2006), available at http://www.usdoj.gov/eoir/statspub/fy06syb.pdf (last visited May 25, 2007).

We read §§ 1229a(7)(C)(1) and 1229c(b)(2), then, as evincing a congressional intent to make the benefits of voluntary departure available only to aliens who agree to give up the fight and leave the country willingly.[8] See Banda-Ortiz, 445 F.3d at 391. This may or may not be wise policy, but it is, we believe, the most plausible construction of the statute. As Azarte notes, the pre-IIRAIRA version of the INA put no time limits on voluntary departure, 8 U.S.C. § 1254(e) (1995), resulting in departure

_____

[8] We do not imply that aliens granted voluntary departure may not move to reopen. As a practical matter, however, aliens who receive voluntary departure should not expect their motions to reopen to be heard before they depart; they should expect to have to renew their attempts at immigration relief from abroad. We fully recognize that such relief will necessarily exclude reopening, because INS rules do not permit an alien subjected to removal proceedings to move to reopen them after leaving the country. See 8 C.F.R. § 1003.23(b)(1). But this rule does nothing to prevent the alien from pursuing the ultimate relief he or she seeks, i.e., the right to remain in the United States legally, through other avenues after complying with a voluntary departure order. Indeed, that is one of the main attractions of voluntary departure from the alien's perspective: it comes without the waiting periods for seeking readmission attendant to an order of removal. See Bocova, 412 F.3d at 265 & n.1. The unavailability of reopening from abroad, then, does not counsel in favor of tolling the departure period based on the filing of a motion to reopen; in fact, it reinforces our conclusion that doing so would disrupt the carefully calibrated bargain reflected in the voluntary departure provisions of IIRAIRA.

-14-

periods that frequently measured one year or more. 394 F.3d at 1284. But IIRAIRA reined in this practice by allowing only 120 or 60 days to depart voluntarily, 8 U.S.C. §§ 1229(a)(2)(A), (b)(2), prohibiting courts from issuing any "stay of an alien's removal pending consideration of any claim with respect to voluntary departure," id. § 1229c(f), and imposing strict and mandatory sanctions on aliens who fail to depart on time, id. § 1229c(d)(1). These provisions reflect a coherent effort to ensure that voluntary departure does, in fact, result in the alien's expeditious departure from the United States. Reading § 1229a(7)(C)(1) as stopping the voluntary departure clock would contravene this purpose, allowing the filing of motions to reopen to delay voluntary departure dates. We cannot read the INA, as amended by IIRAIRA, as achieving this self-defeating result. See Banda-Ortiz, 445 F.3d at 391.

The conclusion we reach has been criticized as overemphasizing IIRAIRA's voluntary departure provisions at the expense of those "expressly codifying the tradition of motions to reopen . . . ." Azarte, 394 F.3d at 1289; see also Banda-Ortiz, 445 F.3d at 391 (Smith, J., dissenting). Chedad makes a similar complaint in arguing that the voluntary departure provision does not undermine his "statutory right" to file a motion to reopen. A statutory right, however, is only as broad as the statute in question has made it. As set forth above, we do not believe that

-15-

IIRAIRA made the right to seek reopening broad enough to supersede the sixty-day limitation on voluntary departure imposed by a different provision of the same act.

Chedad also urges us to disregard the BIA's 1996 decision in Shaar, on which both the IJ and the BIA relied in rejecting his tolling argument. We have recognized that "Shaar's continuing vitality is questionable," Naeem v. Gonzales, 469 F.3d 33, 38 (1st Cir. 2006), but here, that likely infirmity is beside the point. Our decision does not in any way turn on Shaar but on IIRIA itself. Cf. id. The relevant provisions of the act simply do not contemplate suspending the voluntary departure period so that aliens who have chosen that form of relief also can pursue reopening. See Banda-Ortiz, 445 F.3d at 391. That this might lead aliens in removal proceedings to eschew voluntary departure so as not to jeopardize their opportunity to reopen, and thus deprive the government of the benefits of voluntary departure in a number of cases, cannot support judicially rewriting the statute. If Congress thinks it has gone too far, it can make the necessary revisions to the INA.

## III.

Chedad also argues that, by granting his motion to reopen, the BIA vacated its prior decision affirming the IJ's voluntary departure order such that his failure to comply with it could not have triggered the penalties imposed by § 1229c(d)(1).

The government responds that this argument is foreclosed by our decision in DaCosta.  We agree.

In DaCosta, as here, the BIA entered a voluntary departure order against the alien, but, after the departure deadline had passed, granted her motion to reopen the removal proceedings to consider her application for adjustment of status. 449 F.3d at 47.  On remand, the INS argued that the alien was barred from seeking adjustment of status by operation of § 1229(c)(d)(1), because she had not complied with the prior voluntary departure order.  Id. at 48.  The IJ disagreed, ruling that "the BIA's order reopening the case extinguished the legal consequences of [the alien's] failure to depart," but the BIA overturned that ruling on appeal.  Id.  We upheld the BIA's decision, reasoning that while "the BIA's reopening of the case had the legal effect of vacating the [voluntary departure] order, it could not 'retroactively nullify' DaCosta's previous violation of the terms of that order."[9]  Id. at 50-51 (quoting Khalil v. Ashcroft, 370 F.3d 176, 180 (1st Cir. 2004)).

---

[9]Amicus directs our attention to the Seventh Circuit's decision in Orichitch v. Gonzales, 421 F.3d 595 (7th Cir. 2005), which held that, by granting a motion to reopen filed after the deadline set by a prior voluntary departure order had lapsed, the BIA "dispos[ed] of the order that otherwise triggered the operative effect" of § 1229c(d)(1).  Id. at 598.  But this holding is at odds with our holding in DaCosta, which we are bound to apply.  See, e.g., United States v. Malouf, 466 F.3d 21, 26 (1st Cir. 2006).

-17-

The same is true here. The BIA's order of October 25, 2002, rejecting Chedad's appeal from the IJ's denial of his request for a continuance and denying his motion for remand, required Chedad to leave the United States within thirty days or to suffer the consequences enumerated in § 1229(c)(d)(1). Chedad did not do so. Instead, on November 22, 2002, he filed a motion to reopen, which the BIA ultimately granted on February 23, 2003. At that point, Chedad had overstayed his voluntary departure time by nearly three months. Section 1229c(d)(1) provides, unequivocally, that "[i]f an alien is permitted to depart voluntarily under this section and fails voluntarily to depart the United States within the time specified, the alien shall . . . be ineligible for a period of 10 years for any further relief under . . . section[] . . . 1255 . . . of this title." Chedad was permitted to depart voluntarily, but failed to do so within the time specified. He is therefore barred from seeking adjustment of status for ten years. This result follows automatically from Chedad's violation of the voluntary departure order and cannot be altered by the BIA's later decision to reopen the proceedings. DaCosta, 449 F.3d at 51.

As Chedad points out, he filed his motion to reopen before the expiration of the voluntary departure period, while DaCosta waited until after the departure deadline had passed to file hers. In rejecting DaCosta's argument that the BIA nullified its voluntary departure order by reopening her case, we did note

-18-

that the "voluntary departure period had already expired _before_ she filed her motion to reopen with the BIA." 449 F.3d at 50. The outcome in DaCosta, however, turned on when the BIA granted the motion to reopen, not when the motion was filed, because the "order reopening DaCosta's case could not expunge her previous violation of an order to depart." Id. at 51. An alien cannot avoid the consequences of § 1229c(d)(1) by filing a motion to reopen before the departure deadline, allowing the deadline to pass without leaving the country, and receiving a favorable decision on the motion to reopen somewhere down the road. Such a result would be tantamount to tolling the departure period on the basis of a motion to reopen, so long as the motion is ultimately granted. As we have explained, we do not believe that IIRAIRA permits this outcome.

**IV.**

We recognize that the consequences of our decision are harsh: though Chedad's wife is an American citizen, he must leave the United States, and cannot seek adjustment of his own immigration status for another ten years. Moreover, this outcome presumably could have been avoided if Chedad's motion to remand the case on the basis of his wife's newly acquired citizenship, which he filed before the voluntary departure order became final, had been accompanied by his petition for adjustment of status as

-19-

required by the regulations.[10]  Nevertheless, neither the BIA's decision to deny the motion based on this technical misstep, nor the quality of Chedad's counsel's performance, are before us. Chedad's petition presents only questions of statutory interpretation which we have resolved against him.  The petition for review is therefore <u>denied</u>.

**<u>So ordered.</u>**


**- Dissenting Opinion Follows -**

---

[10]    Echoing this sentiment, the dissent suggests that Chedad's case illustrates the importance of treating a motion to reopen as tolling the voluntary departure period, because "with only one minor mistake, he will be required to leave the country and is precluded from seeking any relief for ten years."  In fact, the ten-year bar on relief arises from a mistake of a different character--Chedad's failure to comply with the voluntary departure order despite his undisputed appreciation of the consequences.

**LIPEZ**, <u>Circuit Judge</u>, **dissenting**. Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), Pub. L. No. 104-208, 110 Stat. 3009 (1996), containing both the voluntary departure provision, 8 U.S.C. § 1229c, and the motion to reopen provision, 8 U.S.C. § 1229a(c)(7), seemingly unaware of the conflict it was creating for those aliens who are granted voluntary departure <u>and</u> wish to exercise their statutory right to file a motion to reopen. I respectfully disagree with the majority's resolution of that conflict.

As the majority acknowledges, an alien who files a motion to reopen after being granted voluntary departure, but before she departs, will, absent extraordinary circumstances, be unable to obtain a decision from the BIA before she is required to depart. <u>See</u> <u>Dekoladenu</u> v. <u>Gonzales</u>, 459 F.3d 500, 504 (4th Cir. 2006) ("As a practical matter, the BIA will rarely reach a decision on a motion to reopen before the end of the voluntary departure period."); <u>Banda-Ortiz</u> v. <u>Gonzales</u>, 445 F.3d 387, 393 n.5 (5th Cir. 2006) (Smith, J., dissenting) (describing the backlog of cases before the BIA); 2006 EOIR Stat. Y.B. T2 (stating that in fiscal year 2006, the BIA received 9,256 motions to reopen, about 23% of the total number of appeals filed with the BIA in that year). Once she departs, the alien's motion to reopen is withdrawn, and the limitation of one motion per alien prevents re-filing after departure. 8 C.F.R. § 1003.2(d). If, like Chedad, the alien does

not depart by the expiration of the voluntary departure period, any relief will be denied due to her failure to depart, even if the motion to reopen is granted. 8 U.S.C. § 1229c(d) (stating that a failure to depart within the voluntary departure period will result in ineligibility "for a period of 10 years . . . [for] any further relief," including, inter alia, cancellation of removal, adjustment of status, and change of nonimmigrant classification). Thus, it is effectively impossible for an alien who receives voluntary departure to obtain any relief through the motion to reopen process, despite the seemingly all-inclusive textual provision allowing such motions.

Although the majority acknowledges this conflict, it finds that Congress intended the voluntary departure provision to take precedence over the motion to reopen provision. Under the majority's interpretation, the statutory text allowing "an alien," without further restriction or limitation, to file a motion to reopen, 8 U.S.C. § 1229a(c)(7)(A), in effect applies only to those aliens who do not apply for and receive voluntary departure. I find unpersuasive the reason cited by the majority for its insistence that Congress intended this reading of the statute.

The majority asserts that Congress intended the limitations on the voluntary departure period to be strictly enforced, even at the expense of an alien's right to file a motion to reopen, because of the importance of voluntary departure to the

"smooth functioning of the country's immigration procedures." Relatedly, the majority notes that IIRIRA made a number of changes to the previously existing voluntary departure rules, including limiting the length of the departure period and increasing the sanctions imposed on aliens who failed to comply with the terms of the departure agreement.

I agree with the majority's conclusion that these changes reinforce the point that voluntary departure is a particularly important component of our immigration system. However, in trying to resolve the statutory conflict raised here, we cannot look to IIRIRA's modifications to the voluntary departure scheme without giving equal attention to IIRIRA's adoption of the motion to reopen provision. See Banda-Ortiz, 445 F.3d at 392 (Smith, J., dissenting) (agreeing that "voluntary departure represents a bargain struck between an alien and the government," but objecting "to limiting our search for the terms of that bargain to statutory provisions conferring benefits on only one of the parties"). In other words, the best way to discern Congress' intent when it passed IIRIRA is to examine the statute as a whole, rather than focusing on a single piece. In my view, the panel majority gives short shrift to IIRIRA's simultaneous addition of a right to file a motion to reopen, and, therefore, fails to account for that component of the statute in its assessment of Congress' intent.

-23-

Instead of effectively writing an exception into the motion to reopen provision on such dubious grounds, I would follow the majority of circuit courts and hold that a motion to reopen, filed before the expiration of the voluntary departure period, automatically tolls the running of that period until the BIA resolves the motion. See Azarte v. Ashcroft, 394 F.3d 1278, 1289 (9th Cir. 2005) ("The BIA's interpretation . . . deprives the motion to reopen provision of meaning by eliminating the availability of such motions to those granted voluntary departure. An approach more consistent with the statute as a whole is to toll the voluntary departure period when an alien, prior to the expiration of his voluntary departure period, files a timely motion to reopen . . . . Such an interpretation would effectuate both statutory provisions." (footnote omitted)); see also Ugokwe v. U.S. Att'y Gen., 453 F.3d 1325, 1331 (11th Cir. 2006); Kanivets v. Gonzales, 424 F.3d 330, 335-36 (3d Cir. 2005); Sidikhouya v. Gonzales, 407 F.3d 950, 952 (8th Cir. 2005). But see Dekoladenu, 459 F.3d at 505 (holding that the BIA is not required to toll the voluntary departure period when a timely motion to reopen is filed because of the statutory construction canon requiring that narrower provisions (here, the voluntary departure provision) take precedence over conflicting general provisions (here, the motion to reopen provision)); Banda-Ortiz, 445 F.3d at 390-91 (holding that the BIA is not required to toll the voluntary departure period

-24-

because such tolling would be "in tension with, if not opposed to, limits on the length of and authority to extend voluntary departure," contrary to Congress' intent).

The two statutory provisions at issue here inescapably conflict, creating a certainty that the strict application of one provision will distort the other. Although the majority's approach enforces a literal reading of the voluntary departure provision, it does so by effectively rewriting the plain text of the motion to reopen provision. In the face of such a conflict, tolling offers a way of harmonizing the conflicting statutes instead of choosing between them.

> Tolling . . . accords with all of Congress's objectives in IIRIRA. It preserves the right of all removable aliens to file a single, good-faith motion to reopen after a final adjudicative order of the BIA. It also allows aliens to seek voluntary departure without fear of surrendering other avenues of procedural relief. Finally, it does no damage to Congress's desire to place reasonable limits on the voluntary departure period: The total time initially allotted for departure (and hence the time available to file to reopen) still cannot exceed sixty days, and limiting claimants to one motion to reopen, supported by evidence of newly-discovered facts, will temper the frequency and duration of tolling.

Banda-Ortiz, 445 F.3d at 394 (Smith, J., dissenting).

We have previously stated that tolling the voluntary departure period is not legally equivalent to extending it. Bocova v. Gonzales, 412 F.3d 257, 269 (1st Cir. 2005) ("A suspension of a

-25-

voluntary departure period merely tolls the running of that period; it does not extend it.")[11]; see also Desta v. Ashcroft, 365 F.3d 741, 747 (9th Cir. 2004) (defining a stay of voluntary departure as "stopping the clock from running," but noting that a stay does not "add[] more time to that clock"); Lopez-Chavez v. Ashcroft, 383 F.3d 650, 652 (7th Cir. 2004) ("Staying a voluntary departure order merely tolls the voluntary departure period; after the stay expires . . ., the clock begins ticking again and the alien has the balance of the days left in which to leave the country."). The distinction between a stay or tolling of a period and an extension of the period is widely recognized. See, e.g., Johnson v. Railway Exp. Agency, Inc., 421 U.S. 454, 473 (1975) (Marshall, J., concurring in part and dissenting in part) (noting that the "common understanding" of tolling is that "tolling entails a suspension rather than an extension of a period of limitations"); Sobers v. Shannon Optical Co., 473 A.2d 1035, 1037 (Pa. Super. Ct. 1984) ("[A] suspension of proceedings and a tolling of time limitations cannot be construed as the equivalent of an extension of time.").

---

[11] In Bocova v. Gonzales, we held that an alien who has received voluntary departure and who seeks judicial review of the BIA's resolution of his case must file a motion seeking a stay of voluntary departure before the departure period expires and must explicitly request a stay. 412 F.3d 257, 268-69 (1st Cir. 2005). In that case we rejected the claim that we could reinstate a voluntary departure period that had expired while an appeal was pending with our court; our ability to stay the departure period is limited to cases in which a formal stay is requested before the period ends. Id.

Applying that principle, the tolling approach here does not contravene the text of the voluntary departure provision. As Judge Smith, dissenting from the Fifth Circuit's decision in Banda-Ortiz, observed, reliance on the doctrine of tolling does not "undermine" the statutory text simply because the effect may be to lengthen the number of calendar days before the alien is required to depart. 445 F.3d at 395 (Smith, J., dissenting).

We invoke the tolling remedy in our system of justice where the strict application of the time allotted for a particular action or filing leads to unfair or unjust results. See Salois v. Dime Sav. Bank of N.Y., 128 F.3d 20, 25 (1st Cir. 1997) (observing that "under federal law, equitable tolling is applied to statutes of limitations 'to prevent unjust results or to maintain the integrity of a statute'" (quoting King v. California, 784 F.2d 910, 915 (9th Cir. 1986))). I am not suggesting that the remedy of equitable tolling, in the classic sense, applies here. That remedy applies when the "extraordinary circumstances" of a particular case require relief from the time limits of a statute. Here, we are trying to avoid unfairness on a much larger scale from the unforeseen conflict of two statutory provisions. But that difference only strengthens the argument for the application of a tolling remedy derived from equitable principles that are designed to preserve the integrity of a statutory deadline while avoiding the harshness that can result from its unyielding application.

-27-

The majority asserts that the tolling approach, articulated most fully by the Ninth Circuit in Azarte, 394 F.3d 1278, is premised on the notion that "motions to reopen are available only in proceedings where voluntary departure has been granted." I find nothing in the text or reasoning of the other circuits' opinions suggesting reliance on such a dubious premise. The statute says that all aliens who have been unsuccessful in removal proceedings may file a single motion to reopen, without any reference to those who receive voluntary departure and those who do not. I agree with the majority that there is no conflict between this provision and the voluntary departure provision as applied to those aliens who do not receive voluntary departure. In my view, however, this observation is simply a restatement of the problem and not a resolution of it.

The majority also responds to the tolling approach by saying that Chedad has no "statutory right" to file a motion to reopen because the statute does not provide such a right for those who receive voluntary departure. As the majority puts it: a "statutory right [] is only as broad as the statute in question has made it." However, under the plain text of the statute, Chedad, like every other alien who has been ordered removed, has a right to file a single motion to reopen, so long as he does so within sixty

days of the final order of removal.[12]  8 U.S.C. § 1229a(c)(7)(A).
The statement that Chedad has no "right" to file a motion to reopen
derives not from the text of the statute, but from the majority's
understanding of the legislative intent underlying that statute.
Like the Ninth Circuit, I think "the proposition that Congress,
while expressly codifying the tradition of motions to reopen,
intended sub silentio to preclude their availability in a
significant number of cases," Azarte, 394 F.3d at 1289, is
implausible.

Although this case has all the indicia of a classic
debate over statutory interpretation, it has substantial real world
implications.  In fiscal year 2006, immigration courts granted
voluntary departure to over 22,000 aliens.  2006 EOIR Stat. Y.B.
Q1.  There is no dispute that tolling is unavailable for aliens who
fail to file their motion to reopen prior to the expiration of the
voluntary departure deadline.  See supra note 3.  Importantly,
those aliens who have received voluntary departure already have
been required to show good moral character for five years and the
absence of any convictions for aggravated felonies or crimes of

---

[12]    The statute, 8 U.S.C. § 1229a(c)(7)(C)(i), imposes a ninety-
day deadline for filing motions to reopen.  However, we have
previously held that aliens who have received voluntary departure
must file their motion to reopen prior to the expiration of the
voluntary departure period, which is statutorily limited to sixty
days.  See Naeem v. Gonzales, 469 F.3d 33, 37-38 (1st Cir. 2006).
Therefore, for aliens in Chedad's situation, the effective deadline
for such motions is only sixty days.

moral turpitude.  See 8 C.F.R. § 1240.26(c)(1); see also Banda-Ortiz, 445 F.3d at 393 (Smith, J., dissenting) ("The result is particularly harsh when one considers that it operates to disadvantage those aliens whose good behavior has entitled them to the solicitude of the law of voluntary departure.").  Even if only a small percentage of those aliens granted voluntary departure would file a timely motion to reopen, the majority's decision unwisely precludes any possibility of relief for aliens who might be entitled to such relief despite the exacting standards applicable to motions to reopen.

The specific facts of this case illustrate that harsh reality.  Chedad has been in the United States for thirteen years, and has been in immigration proceedings for almost ten years, after he overstayed his six-month non-immigrant visa.  At the time the proceedings began, he was married to a lawful permanent resident, who had a pending application for naturalized citizenship, and he has consistently asked the IJ and the BIA for a continuance so that his wife's application could be processed and, accordingly, his status could be adjusted to that of a lawful permanent resident. See 8 U.S.C. § 1151(b)(2)(A)(i).  Although the IJ initially granted Chedad a continuance, the IJ refused to allow any further delays after a year.  Chedad requested and received voluntary departure, and asked again for a continuance.  The IJ denied his request and gave him sixty days to leave the country.  Chedad promptly filed an

appeal with the BIA.  While his appeal was pending, his wife's citizenship was approved.  With his appeal still before the BIA, Chedad filed a timely motion to remand, asking that his case be sent back to the IJ, before the BIA had decided the appeal, so that he could adjust his status in light of his wife's American citizenship.

Chedad, however, made his one and only procedural error at that time. His motion to remand was not accompanied by a petition for adjustment of status, as the regulations required.  On the basis of this technical oversight, the BIA denied the motion to remand and reinstated the IJ's voluntary departure order. Therefore, Chedad could only present evidence of his wife's change in citizenship status through a motion to reopen filed with the BIA.  He filed that motion in a timely manner.  The BIA, in fact, granted the motion to reopen, finding that he had made a prima facie showing of his eligibility for adjustment of status.[13]  The BIA sent his case back to the IJ, who then denied all relief because Chedad had remained in the country after the expiration of the voluntary departure period.  If the timely filing of Chedad's motion to reopen tolled the running of the sixty-day voluntary

---

[13]   In order to prevail on a motion to reopen, an alien must satisfy two requirements: she must "establish a 'prima facie case for the underlying substantive relief sought' and . . . introduce 'previously unavailable, material evidence.'" Fesseha v. Ashcroft, 333 F.3d 13, 20 (1st Cir. 2003) (quoting INS v. Abudu, 485 U.S. 94, 104 (1988)).

-31-

departure period, he could have presented his case for relief to the IJ.

Chedad has shown consistent cooperation and compliance with a maze of immigration laws and regulations. He has demonstrated his good moral character for a period of five years and has not been convicted of any aggravated felonies or crimes of moral turpitude. He is married to an American citizen and now, after nearly a decade of navigating our legal system, with only one minor mistake, he will be required to leave the country and is precluded from seeking any relief for ten years. That stark outcome may be repeated many times over by the failure to harmonize the conflicting statutory provisions at issue in this case in a sensible and fair manner.

I respectfully dissent.